UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


HAROLD DEWHURST and DAVID BRYAN,
on behalf of themselves
and all other persons
similarly situated, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

        Plaintiffs

v.                                      Civil Action No. 2:09-1546


CENTURY ALUMINUM COMPANY,
CENTURY ALUMINUM OF
WEST VIRGINIA, INC.,
CENTURY ALUMINUM MASTER WELFARE BENEFIT PLAN,
DOES 1 THROUGH 20,

        Defendants


MEMORANDUM OPINION AND ORDER


        Pending is plaintiffs' motion for preliminary

injunction seeking a continuation of retiree healthcare benefits

with respect to retirees who retired prior to the current June 1,

2006, collective bargaining agreement ("CBA").  On February 18,

2010, the court conducted the preliminary injunction hearing.

I.

A.    Introduction

          On November 13, 2009, plaintiffs, who are retired
employees from a facility operated by one or more of the
defendants, instituted this action in the United States District
Court for the Southern District of Ohio.  On December 23, 2009,
the action was transferred here.  The court has certified a class
today, which consists of approximately 437 retirees, along with
the benefit-eligible spouses and dependents of deceased retirees.
The two-count class action complaint alleges that Century's
actions contravene the applicable CBAs in violation of section
301 of the Labor Management Relations Act, 29 U.S.C. § 185, and
violate sections 502(a)(1)(B) and (a)(3) of the Employee
Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) and
(a)(3).

          Century operates aluminum plants in Ravenswood, West
Virginia ("facility"), Hawesville, Kentucky, Mt. Holly, South
Carolina, and Iceland.  In 1989, Ravenswood Aluminum Corporation,
in an asset sale, purchased the primary aluminum smelting and
related operations of the facility from Kaiser Aluminum

2

Corporation ("Kaiser").  Up to that point, Kaiser and the Union had a 30-year bargaining history touching on the matters now in controversy.

Ravenswood Aluminum Corporation assumed the then-current CBA between the Union and Kaiser, which had been executed on April 4, 1988.[1]  In 1997, the Ravenswood plant was renamed Century Aluminum of West Virginia, Inc.

The retirees were represented by the Union during their employment by Century and its predecessors.  The Union negotiated a series of successive CBAs with Century and its predecessors governing the terms and conditions of hourly employment.  One component of these successive CBAs was the provision of retiree healthcare benefits, which appear to have been contemplated in the successive CBAs agreed upon since 1959.  The primary question for resolution is whether the current 2006

---

[1]The court is aware of Century's position that, in 1989 when it purchased the facility from Kaiser, it assumed only the then-current CBA and not any earlier CBAs or the retiree healthcare benefits agreed upon in those earlier CBAs.  Nevertheless, the collective bargaining history at the facility and the treatment of the retirees over the decades provides a helpful historical context that aids the interpretive process.  See Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 62 (4th Cir. 1989)(stating that "'[i]n order to interpret . . . [a CBA] it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.'") (quoting Transportation-Communication Employees Union v. Union Pacific R.R. Co., 385 U.S. 157, 161 (1966)).

3

CBA, which became effective June 1, 2006, and has been extended to August 31, 2010, provides customary healthcare benefits to approximately 437 retirees who retired prior to June 1, 2006, as well as their spouses and other dependents.  They apparently received such benefits until January 1, 2010.

B.    The Termination of Retiree Healthcare Benefits

In its response brief, Century details the financial challenges it faced beginning in 2007 based upon the volatility in aluminum prices.  Rising healthcare costs, Century's inability to sell aluminum at profitable prices, and other factors, contributed to cash operating losses of $34,000,000 in 2007 and $9,000,000 in 2008.  After curtailing all operations at the facility, Century continued to suffer negative cash flow.  One component was approximately $14,250,000 in healthcare benefits provided to active, laid-off, and retired employees.  Century projected that the healthcare benefits for retirees would total $3.5 million for 2009.

On October 19, 2009, Century sent letters to those retirees who left Century prior to the effective date of the 2006 CBA, stating its intention to modify or terminate their healthcare benefits effective January 1, 2010.  Century's

4

decision affected those former employees who retired after February 6, 1989, and before June 1, 2006.[2]  The letter provided that all retiree healthcare benefits would terminate for those 65 or older with a retirement date in the aforementioned time range. For those retirees in that same time range who had not yet reached 65 years of age, a system of monthly premiums, deductibles, and increased co-payments was instituted.  The letter also claimed that Century possessed an unqualified right to unilaterally change or terminate health coverages at any time. Plaintiffs set forth in their briefing at great length the significant, negative impact this newly imposed financial burden will visit upon them.

    In sum, plaintiffs assert that the healthcare benefits the retirees are receiving are vested, last a lifetime, and are

---

[2]The same date range applies to the class certified by the court today.  It appears that the transaction between Kaiser and Ravenswood Aluminum Corporation imposed retiree liability upon Ravenswood Aluminum Corporation only for those employees retiring on and after February 6, 1989.  At the opposite end of the time line, only those individuals retiring from Century prior to June 1, 2006, are affected by Century's modification/discontinuation decision.  The court has gleaned as much from the transcript of the February 18, 2010, oral argument.  In response to the court's suggestion that Century was continuing to pay healthcare benefits for those who retired after June 1, 2006, the effective date of the 2006 CBA, counsel for plaintiffs stated as follows: "They haven't been cut at all, and we're worried about that obviously, but they are not in dispute at this point."  (Trans. at 8). After being given an opportunity to be heard, counsel for Century did not take issue with the representation.

not subject to termination or modification by Century.
Plaintiffs seek a preliminary injunction during the pendency of
this action directing Century to fully reinstate the modified
and/or terminated retiree healthcare benefits.

C.   Relevant Provisions of the CBAs

From 1959 through the present day, successive CBAs
covering the facility have contained, or incorporated by
reference, language obligating Century or its predecessors to
provide some form of healthcare benefits at no cost to the
retirees.  The 1959, 1962, 1963, and 1965 CBAs include the
healthcare benefits negotiated for active and retired employees.[3]
The CBAs entered into thereafter reference other sources, such as
Group Insurance Plan booklets and Summary Plan Descriptions
(collectively "SPDs") incorporated into the CBAs by reference.[4]
The court summarizes the contents of the CBAs and SPDs from 1959
through 1985.

_____

[3]The successive CBAs up to 1965 were executed on the
following dates: August 1, 1959, August 1, 1962, July 26, 1963,
and June 1, 1965.

[4]The SPDs are dated June 1, 1971; January 1, 1981; June 1,
1983; July 1, 1985; June 12, 1992; January 1, 1995; June 1, 1999;
January 1, 2008.  As explained more fully infra, the 2008
document is referred to by the parties as the 2006 SPD.

Article 15 of the 1959 CBA provides for retiree healthcare benefits up to a stated annual maximum.  The retiree's spouse was subject to termination of benefits upon the retiree's death or upon reaching the same monetary maximum, whichever first occurred.  Notably, Article 21 of the 1959 CBA, which expired July 31, 1962, provided additionally as follows: "[T]he terms and conditions of this Agreement, and each of them, shall continue in effect until July 31, 1962 . . . ."  (1959 CBA at 75).  Essentially similar provisions are found in the 1962, 1963 and 1965 CBAs, together with a 1968 extension, that cover the years down to June 1, 1971.

In 1971, the parties began using the combination of a CBA and SPD during this bargaining cycle.  The 1971 SPD states that it is part of the 1971 CBA.  Upon the death of the retiree, his surviving spouse and dependent children continued to have coverage for six months.  The 1971 SPD specifically provided that its benefits "remain[ed] in effect for the term of the 1971 . . . [CBA]." (1971 SPD at 33).

The 1981 SPD contained a similar provision[5], as did the 1985 SPD which continued to provide retiree healthcare benefits,

---

[5]The parties furnish nothing further respecting the period from the 1971 CBA to the 1981 CBA.

with the same proviso concerning the time limit of the coverage: "such benefits shall remain in effect for the term of the 1985 Labor Agreement." (1985 SPD at 68).

Though the parties have been unable to locate the 1988 SPD, the 1988 CBA provides at Article 15.A.1 as follows:

> The Group Insurance Benefits shall be set forth for each plant in booklets entitled Employees' Group Insurance Program and Retired Employees' Group Insurance Program, and such booklets are incorporated herein and made a part of this 1988 Labor Agreement by such reference.

(1988 CBA at 116).  A specific termination provision is found at Article 15.A.2:

> It is understood that this Agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on May 25, 1988, except as otherwise provided in the applicable booklet, and further that such benefits shall remain in effect for the term of this 1988 Labor Agreement.

(Id. at 116).

As noted, Ravenswood Aluminum Corporation assumed the 1988 CBA between the Union and Kaiser, which was set to expire on October 31, 1990.  On February 2, 1989, Ravenswood Aluminum Corporation and the Union entered into the "RAC-USWA AGREEMENT," which included the following terms:

> RAC shall assume any and all current labor agreements, both written and oral, including pension assets and related liabilities, and current local agreements, which currently exist between Kaiser and USWA . . . .

8

. . . .

RAC agrees to pay retiree medical and life insurance
benefits for all eligible employees (including Employed
Hourly Retirees) who retire from the employment rolls
of RAC.

(Id. ¶ 4).

Ravenswood Aluminum Corporation and the Union
thereafter negotiated a new CBA, which became effective on June
12, 1992.[6]  Articles 15.A.1 and 15.A.2 are materially identical
to those quoted above from the 1988 CBA, except for the dates
used, which reflect that the 1992 CBA terminates no earlier than
May 31, 1995.  The 1992 SPD, referenced in and incorporated into
the 1992 CBA, continues to limit retirees to the specific benefit
plans under which they retire.

This booklet describes a Plan of Life Insurance for
retired employees and Health Care Plans and Mail
Service Prescription Drug Benefits for retired
employees and their dependents and pensioned surviving
spouses of employees.  The Plan is applicable to
retirees and surviving spouses who retired or commenced
receiving a surviving spouse pension from the
Ravenswood Aluminum Corporation Hourly Employees'

---

[6]In 1990, a labor dispute transpired between Ravenswood
Aluminum Corporation and the Union.  Following expiration of the
1988 CBA on October 31, 1990, the parties attempted to negotiate
a new CBA without success.  The 1,700 employees were locked out
on October 31, 1990, and the facility was operated with managers
and replacement workers ("1990-92 Lockout").  A 16-month impasse
followed, along with an additional, unexplained interval of
three-and-one-half months, after which the 1992 CBA was executed.

> Pension Plan on or after June 12, 1992. Employees who
> retired prior to June 12, 1992, are covered by the Plan
> in effect at their date of retirement as described in a
> separate booklet.

(Id. at 1).  The 1992 SPD also contains Section 7.6, which again
appears to cancel a dependent's and surviving spouse's health
care and prescription drug benefits upon the death of the
retiree:

> Benefits under the Health Care Plans and the
> Prescription Drug portions of the Plan are provided for
> eligible dependents on the same basis as your own. . .
> . Your coverage on account of a dependent shall cancel
> on the date such person is no longer an eligible
> dependent as defined or upon your death, whichever
> occurs first.

(1992 SPD at 75).[7]  This same provision is found in all the
successive SPDs. (See 1995 SPD at 87; 1999 SPD at 74; 2006 SPD at
33).

        The 1994 CBA became effective on November 30, 1994,
with an expiration date of May 31, 1999.  Articles 15.A.1 and
15.A.2 are materially identical to those referenced above from

---

[7] While Section 7.6 of the 1992 SPD cancels health and
prescription coverage to dependents upon the retiree's death,
those dependents can elect to continue coverage for up to 36
months under COBRA by paying monthly premiums.  (See 1992 SPD at
99-103).  The subsequent SPDs, up to and including 1999, all
contain a Section 7.6 and speak to continued coverage through
COBRA.  The 2006 SPD also contains similar language regarding
cancellation of coverage and COBRA, albeit with different section
numbers.  (See 2006 SPD at 32 and Appendix B).

the 1988 and 1992 CBAs.  The retiree healthcare benefits were to "remain in effect for the term of this 1994 Labor Agreement." (1994 CBA at 182).

The SPD attached to the 1994 CBA became effective January 1, 1995 ("1995 SPD").  The language within the 1995 SPD is similar to the 1992 SPD with one substantive difference.  The 1992 SPD covered only employees retiring after June 12, 1992, the effective date of the 1992 SPD, while additionally noting that those retiring prior to June 12, 1992, were covered by the SPD in effect on the date of their retirement.  The 1995 SPD covers those retirees and surviving spouses who "retired or commenced receiving a surviving spouse pension . .  on or after February 7, 1989."  (1995 SPD at 1).  The 1995 SPD also provides continuation language to the effect that those "who retired on or after February 7, 1989, . . . [would] be enrolled in" a "Health Care Program" that included participation in the Ravenswood Aluminum Preferred Provider Plan for medical treatment ("continuation language").  (1995 SPD at 5).  This continuation language also appears in the 1999 SPD but is absent from the 2006 SPD. (1999 SPD at 4).  The 1995 SPD again reflects that its "benefits shall remain in effect for the term of the Labor Agreement."  (Id. at 92).

11

The 1999 CBA also includes the Article 15 language carried through the CBAs since 1988.[8]  The 1999 CBA became effective June 1, 1999, and was set to terminate no earlier than May 31, 2003.  The parties subsequently agreed to an extension of the 1999 CBA, such that its termination date became May 31, 2006.  The 1999 CBA, like its predecessors, incorporated the 1999 SPD as part of the CBA.  The 1999 SPD language also remained very similar to that of its predecessor documents.  It provides for a coverage-date method similar to that found in the 1992 SPD as follows:

> This booklet describes . . . [a] Health Care Plan and Prescription Drug Plan Benefit[] for retired employees and their dependents and pensioned surviving spouses of employees.  The Plan is applicable to Ravenswood Reduction Plant retirees and surviving spouses who retired or commenced receiving a surviving spouse pension from Century Aluminum of West Virginia, Inc.  The Century Aluminum of West Virginia, Inc. Hourly Employees' Pension Plan on or after June 1, 1999

---

[8]The Article 15 language appears to have been lifted verbatim in error from the 1994 CBA.  Instead of using updated dates, Article 15 of the 1999 CBA references "the 1994 Labor Agreement" and that all of the group insurance benefits become effective on November 30, 1994.  (1999 CBA at 193).  To avoid an otherwise nonsensical interpretation, the court treats the reference to the year 1994 as being 1999, except that the effective date of the 1999 SPD will be treated as being June 1, 1999, in accordance with the effective date listed elsewhere in that SPD.

. . . .[9]

> The Plan has been established pursuant to Article 15 of
> the Labor Agreement dated June 30, 1999, between the
> [Union] and [Century].  Except as otherwise provided
> herein, the group benefits are effective June 1, 1999.
> This booklet, which describes the benefits, constitutes
> a part of the Labor Agreement.

(1999 CBA at 1).  Again, the 1999 SPD prescribes that the

benefits reflected within it "shall remain in effect for the term

of the Labor Agreement."  (1999 SPD at 79).

     The final CBA at issue was executed and effective on

June 1, 2006, with a termination date of May 31, 2009.  The

parties extended the 2006 CBA to terminate as of August 31, 2010.

The 2006 version is identical or similar to its 1999

predecessor.[10]  Section 15 of the 2006 CBA provides as follows:

> A.   The group insurance benefits shall be set forth in
>      booklets entitled Employees' Group Insurance Program

---

[9]The court treats the language commencing with "The Plan"
and concluding with "June 1, 1999" as constituting a single
sentence.  Within that sentence, "Century Aluminum of West
Virginia, Inc." is treated as being the author or sponsor of "The
Century Aluminum of West Virginia, Inc. Hourly Employees' Pension
Plan."  The spacing between the sponsor and the plan is as
appears in the original document.

[10]In contrast to past practice, Century published a "2007
Master Plan SPD" without first consulting the Union.  The 2007
Master Plan SPD never became effective and is not an operative
plan document.  Following some controversy on the point, set
forth more fully infra, the Union and Century developed a jointly
prepared SPD instead, which was published in January 2008.
Despite the publication date, the document is referred to as the
2006 SPD.

and Retired Employees' Group Insurance Program, and such booklets are incorporated herein and made a part of this 2006 Labor Agreement by such reference.

B.    It is understood that this Agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on June 1, 2006 except as otherwise provided in the applicable booklet, and further that such benefits shall remain in effect for the term of this 2006 Labor Agreement.

(2006 CBA at 95).  Similar to those SPDs preceding it, the 2006

SPD sets forth its reach at the outset, making its terms

applicable

to Ravenswood Reduction Plant retirees and surviving spouses who retired or commenced receiving a surviving spouse pension from Century Aluminum of West Virginia, Inc.  The Century Aluminum of West Virginia, Inc. Hourly Employees' Pension Plan on or after June 1, 2006 . . . .

This Plan has been established pursuant to Article 15 of the Labor Agreement dated June 1, 2006, between the United Steelworkers and Century Aluminum of West Virginia, Inc.  Except as otherwise provided herein, the group benefits are effective June 1, 2006.  This booklet, which describes the benefits, constitutes a part of the Labor Agreement.

(2006 SPD at 2).

At least two observations are worth mention in summary.

First, all of the CBAs, and the SPDs incorporated therein, that

have governed the Century/Union relationship following the sale

from Kaiser specify that retiree healthcare benefits are

effective only during the lifetime of the particular CBA in

14

effect at the time.  Second, the 1995 and 1999 SPDs, but not the 2006 SPD, each contain continuation language that arguably obligates Century to pay healthcare benefits, during the life of the CBA to which the SPD relates, to those who have retired prior to the effective date of the SPD under consideration.

D.   Extrinsic Evidence

Plaintiffs have offered extrinsic evidence which they assert to be supportive of their position that their healthcare benefits have vested.  First, they note a recent attempt by Century to include a reservation of rights within the 2007 Master Plan SPD.  After the Department of Labor directed Century to produce a plan document related to the 2006 CBA, the 2007 Master Plan SPD was provided to the Union.  It contained the following language:

> The Plan Document and this SPD shall be subject to amendment, modification, and termination in accordance with any of its provisions by the Employer, or by mutual agreement between the Administrator and the Employer without the consent or concurrence of any Member. By electing medical and hospital benefits under the Plan or accepting the Plan benefits, all Members legally capable of contracting and the legal representatives of all Members incapable of contracting, agree to all terms, conditions, and provisions hereof.

(Pls.' Mem. in Supp. at 12 (quoting 2007 Master Plan SPD)). Following an objection by the Union, the reservation-of-rights

15

language was removed.  The Union asserts that Century
contemporaneously assured it that it never claimed a right to
alter retiree healthcare benefits.  In fact, plaintiffs contend
that Century retained this language in the 2007 Master Plan SPD:

> Future of the Plan
>
> It is Century Aluminum's intent that the Century
> Aluminum Master . . . Plan will continue indefinitely.
> However, Century Aluminum reserves the right to amend,
> modify, suspend or terminate the plan, in whole or in
> part, by action of the Century Aluminum Labor Relations
> Department, subject to union negotiations.

(Id. at 12 quoting 2007 Master Plan SPD at 140 (noting also the
2007 Master Plan SPD provision that the retiree healthcare
benefits at issue were "maintained subject to a collective
bargaining agreement.")).  As noted, the 2007 Master Plan SPD
never became effective.  Instead, a Century/Union agreed SPD was
published in January 2008, and is referred to as the 2006 SPD.

        Second, plaintiffs assert that Century officials have
repeatedly represented to bargaining unit members that retiree
healthcare benefits last for a lifetime.  For example, Roger
Walters, a former Century hourly employee who retired in April
2006, received an informational handout from Century on or about
April 14, 2006, near his retirement date.  The document provided
as follows:

> Q.   IS MY SPOUSE COVERED BY THE SAME HEALTH PLAN AND CAN
>      HE/SHE CONTINUE THIS COVERAGE AFTER MY DEATH?
>
> A.   Your spouse is covered by the same plan as you,
>      provided he or she was your spouse at the time of your

> Retirement. **If you predecease your spouse, he or she may continue coverage under the plan for his/her Lifetime**.

(Doct. 18-20 at 11 (emphasis supplied)).  The same document was provided to retiree Ted Cochran when he retired from Century in 2003.[11]  Nevertheless, as earlier noted, the then governing 1999 SPD specifies that healthcare coverage for the spouse ends upon the retiree's death.[12]

Third, plaintiffs note the matter of supplemental Medicare coverage.  Under the 2006 SPD, they assert that Century is obligated to reimburse the monthly Medicare premium paid by those of their number who reach age 65.  Under the Century Pension Plan, however, an employee may retire at age 55, meaning that "this [healthcare benefit] promise would not be fulfilled

---

[11]Plaintiffs also note a document provided to Boyd Baisden on April 3, 1996, which states that "[a]s a retiree of Ravenswood Aluminum Corporation, [he] . . . understand[s] that . . . [he] may continue under the medical coverage plan offered to . . . [him] by the Company prior to . . . retirement." (Doct. 34-5 at 1).

[12]The actual nature of coverage termination for spouses, who qualify as dependents, is left unexplained by counsel.  As noted, the 1992, 1995, 1999, and 2006 SPDs all provide the termination of dependent coverage upon the retiree's death.  Those same documents, however, extend healthcare benefits to a surviving spouse who receives a pension following the death of his or her retiree spouse.  Inasmuch as the parties do not address this apparent tension, the court need not resolve the matter presently.

17

for at least 10 years, well beyond the duration of the applicable CBA."  (Pls.' Memo. in Supp. at 16).

Fourth, during the 1990-92 Lockout, while no CBA was in effect, Century no longer provided healthcare benefits to active employees.  It continued, however, to provide those benefits to retired former employees.

II.

A.    Governing Standards

In Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342 (4th Cir. 2009), vacated --- U.S. ---, 2010 WL 1641299, at *1 (Apr. 26, 2010), reinstated in part, No. 08-1977, slip op. at 3 (4th Cir. Jun 8, 2010), our court of appeals abandoned its longstanding approach for passing on motions seeking a preliminary injunction.[13]  That analysis, first

---

[13]A brief order simultaneously granted certiorari and vacated the judgment in Obama.  On June 8, 2010, the court of appeals entered an order on remand stating, in pertinent part, that it would "reissue Parts I and II of . . . [its 2009 decision in Obama] . . . articulating the standard for the issuance of preliminary injunctions."  Id.  The court thus applies the standards governing entry of a preliminary injunction as stated at pages 345 through 347 of the 2009 decision in Obama.

announced in Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977), was shelved in favor of a stricter approach suggested in Winter v. Natural Resources Defense Council, Inc., --- U.S. ----, 129 S. Ct. 365 (2008).  See, e.g., Obama, 575 F.3d at 346 ("Our Blackwelder standard in several respects now stands in fatal tension with the Supreme Court's . . . decision in Winter.").

The decision in Obama reiterates that "[a] preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief pendente lite of the type available after the trial."  Obama, 575 F.3d at 345 (citing In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 524-26 (4th Cir. 2003))(emphasis added); see also De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 220-21 (1945).

The characterization of the remedy appears appropriate. Granting the ultimate relief requested, even temporarily, at an early point in the case, often prior to the issues even being joined in the pleadings, seems rightly reserved for only the most compelling of cases. Id. at 346 ("The . . . [Supreme Court's] requirement that the plaintiff clearly demonstrate that it will likely succeed on the merits is far stricter than the Blackwelder requirement that the plaintiff demonstrate only a grave or

serious question for litigation."). For that reason, "the party seeking the preliminary injunction must demonstrate by 'a **clear showing**' that, among other things, it is likely to succeed on the merits at trial." Id. (emphasis added) (quoting Winter, 129 S. Ct. at 376).

In order to obtain a preliminary injunction, the movant must clearly establish four things: "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" Id. at 346 (quoting Winter, 129 S. Ct. at 374). In a departure from the former Blackwelder standard, which allowed some play in the joints[14] between the four factors, the court of appeals in Obama stressed that "all four requirements must be satisfied." Id. at 347 (reiterating that "Winter articulates four requirements, each of which must be satisfied . . . .").

---

[14]The decision in Obama specifically cast aside that portion of Blackwelder that "allow[ed the four] requirements to be conditionally redefined as other requirements are more fully satisfied so that 'grant[ing] or deny[ing] a preliminary injunction depends upon a "flexible interplay" among all the factors considered . . . for all four [factors] are intertwined and each affects in degree all the others.'" Obama, 575 F.3d at 347.

20

With respect to analysis of the numerous documents in this action, the court of appeals has provided the following standard in <u>Keffer v. H.K. Porter Company, Inc.</u>, 872 F.2d 60, 64 (4th Cir. 1989), a decision that involved whether certain welfare benefits continued beyond the expiration of a collective bargaining agreement in which they were found:

> In determining whether an employer's obligation to provide benefits to its retirees or their surviving spouses continues beyond the expiration of the collective bargaining agreement, we look to the parties' intent as expressed in their agreement. While the question therefore is primarily one of contract interpretation, collective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy. Therefore, "[i]n order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." Of course, as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties' intent.  "The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion."

<u>Id.</u> at 62 (citations omitted); <u>see also</u> <u>District 29, United Mine Workers of America v. Royal Coal Co.</u>, 768 F.2d 588, 590 (4th Cir. 1985) ("Whether an employer's obligation to provide benefits to its retirees continues beyond the expiration of the underlying collective bargaining agreement depends upon the intent of the parties.  Moreover, whether the parties intended such an

employer's obligation to continue beyond the expiration of the collective bargaining agreement is primarily a question of contract interpretation.") (citations omitted).

There are limits though to the loosened rules of contract construction in the collective bargaining context. Courts will bar extrinsic evidence that is inconsistent with an unambiguous writing.  See, e.g., Pace v. Honolulu Disposal Serv., Inc., 227 F.3d 1150, 1157-58 (9th Cir. 2000); Brown-Graves Co. v. Cent. States, Southeast & Southwest Areas Pension Fund, 206 F.3d 680, 683 (6th Cir. 2000) (refusing, where collective bargaining agreement was unambiguous, to consider extrinsic evidence of "informal arrangement" between employer and union); see also Bonnell/Tredegar Industries, Inc. v. N.L.R.B., 46 F.3d 339, 345 (4th Cir. 1995)("We, too, conclude that it is clear from the language of the Agreement itself that the parties intended to retain the existing Christmas bonus plan; no extrinsic evidence as to the parties' intent in that respect is necessary.").

Additionally, the explicit and unambiguous language found in a series of labor agreements might be deemed the best indicator of the parties' longstanding expectations of one another.  See, e.g., 20 Richard A. Lord, Williston on Contracts § 55:23 (4th ed. 2010)("While there is thus some debate concerning

22

how and the extent to which the parol evidence rule applies to collective bargaining agreements, there seems to be general agreement among most courts that parol evidence of the parties' bargaining history may be used to explain or supplement the terms of the collective bargaining agreement, but may not be admitted to prove an agreement at variance with the normal or customary meaning of the words chosen by the parties to express their agreement."); 12 Employment Coordinator -- Labor Relations § 47:17 (Elec. ed. 2010) ("While there is broad latitude in the admissibility of bargaining history to construe a collective bargaining agreement, where the meaning of the clause in question is clear, no interpretation is necessary, and evidence of bargaining history is not admissible to explain its meaning.").

B.    Clear Likelihood of Success on the Merits

        The best method for determining if plaintiffs have satisfied their rigorous burden under <u>Obama</u> is to examine the contentions they offer in support of a vesting determination. First and foremost, they rely upon <u>International Union, United Auto., Aerospace, and Agr. Implement Workers of America (UAW) v. Yard-Man, Inc.</u>, 716 F.2d 1476 (6th Cir. 1983).  That decision by the United States Court of Appeals for the Sixth Circuit provides that "when the parties contract for benefits which accrue upon

achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."  Id. at 1482.

Plaintiffs assert that our court of appeals adopted the Yard-Man inference in Keffer.  They reference the following language from Keffer in support:

> As the district court recognized, then, both the language in the parties' agreements and the conduct of Connors' representatives indicate that the benefits at issue here were intended to continue beyond the expiration of the collective bargaining agreement. Such a determination is also consistent with a more far-reaching understanding of the context in which retiree benefits arise.  Because benefits for retirees are permissive rather than mandatory subjects of collective bargaining, see Yard-Man, 716 F.2d at 1482, . . . "it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." Yard-Man, 716 F.2d at 1482. Surely the parties to the collective bargaining agreement realized that employees who are willing to forego current compensation in expectation of retiree benefits "would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements."

Keffer, 872 F.2d at 64.

At least one court of appeals, and some commentators, seize upon this brief mention to suggest, with little to no analysis, that our court of appeals adopted the "far-reaching" Yard-Man inference.  See, e.g., International Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v.

_Skinner Engine Co._, 188 F.3d 130, 140-41 (3rd Cir. 1999) ("It appears that the First, Fourth, and Eleventh Circuits also apply the _Yard-Man_ inference." ); Richard L. Kaplan _et al._, _Retirees at Risk: The Precarious Promise of Post-Employment Health Benefits_, 9 Yale J. of Health Pol'y, Law, and Ethics, 287, 308-09 (2009)(citing _Keffer_ for the proposition that "[s]ome circuits deem the inference a strong factor in ascertaining the intent of the parties to a CBA . . . ."); Jason Blumberg, _Bringing Back the Yard-Man Inference_, 4 U. Pa. J. Lab. & Emp. L. 195, 202 (2001) ("Presently, the Fourth, Sixth, and Eleventh Circuits accept the _Yard-Man_ inference.").[15]

These authorities read more into _Keffer_ than it says. The _Keffer_ decision's quotation of _Yard-Man_'s reasoning comes only after the panel concluded that the retiree healthcare benefits at issue had vested.  That vesting analysis rested not on _Yard-Man_, but upon (1) the language of the controlling documents, and (2) certain extrinsic evidence.  In essence, the court of appeals in _Keffer_ concluded that its reasoning, and _Yard-Man_'s more "far-reaching" analysis, had yielded the same

---

[15]Unanimity is lacking on the point.  A member of this court has read _Keffer_ more narrowly.  _Chapman v. ACF Industries LLC_, 430 F. Supp.2d 570, 573 (S.D. W. Va. 2006)("Although _Keffer_ relies in part on _Yard-Man_, it does not expressly adopt the inference.") (Chambers, D.J.).

result.[16]  The reference to <u>Yard-Man</u> was unnecessary to the decision in <u>Keffer</u> and, as such, it is properly regarded as <u>dictum</u>.[17]

Second, plaintiffs assert that vesting is indicated inasmuch as their eligibility for healthcare benefits is tied to their entitlement to a pension.  Relying exclusively upon decisional law from the United States Court of Appeals for the Sixth Circuit and district courts in that circuit following <u>Yard-Man</u>, plaintiffs contend that this linkage means that as long as they receive a pension they are likewise entitled to healthcare benefits.

Inasmuch as the court has concluded that the foundational decision in <u>Yard-Man</u> is not part of the law of this

---

[16]Plaintiffs additionally assert that an unpublished decision, <u>Trull v. Dayco Prods., LLC</u>, No. 04-2109, 2006 WL 1130926 (4th Cir. Apr. 28, 2006), supports their view of <u>Keffer</u>'s reach.  The unpublished decision in <u>Trull</u> is not binding precedent.  Additionally, the circumstances there involved a jury finding that certain employee benefits had vested.  That is unlike the instant case, where the court is called upon to apply the peculiar rules of interpretation and construction applicable to labor agreements.  Irrespective of the distinction, <u>Yard-Man</u> is nowhere mentioned in <u>Trull</u>.

[17]It is worth noting that a number of circuits have explicitly rejected the <u>Yard-Man</u> inference.  <u>Skinner Engine</u>, 188 F.3d at 139-41; <u>United Paperworkers Int'l Union v. Champion Int'l Corp.</u>, 908 F.2d 1252, 1261 n.12 (5th Cir. 1990); <u>Anderson v. Alpha Portland Indus.</u>, 836 F.2d 1512, 1517 (8th Cir. 1988).

26

circuit, it would be inappropriate to apply rules of construction developed therefrom.[18]  Moreover, the "tying" language identified by plaintiffs relates to surviving spouses' eligibility for healthcare benefits; no similar tying arrangement appears applicable to retirees.  Additionally, Century responds that language in the parties' pension agreements explicitly suggesting vesting as to pension benefits in actuality undercuts an inference of vesting as to healthcare benefits.  Representative language from the January 1, 2002, Hourly Employees Pension Plan Summary ("2002 PPS") states as follows:

> Generally, once pension payments commence they are payable monthly for your life. . . .
>
> . . . .
>
> Generally, the amount of pension you have earned under the Plan cannot be reduced by the Company.

(2002 PPS at 5-6).  In sum, Century aptly contends that the language referenced indicates that the parties understood how to vest an employee or retiree benefit when they chose to do so.  The failure to do so explicitly with retiree healthcare benefits, Century asserts, is telling.[19]

---

[18]The same is true of plaintiffs' other contentions based entirely upon Yard-Man and its progeny.

[19]Plaintiffs identify other pension language, in the Century Aluminum of West Virginia, Inc. Hourly Employees Pension Plan effective June 1, 1999 ("1999 Pension Plan"), that they assert
(continued...)

Third, in their opening brief plaintiffs rely upon
language found in the 1995 SPD that eligible dependents,
including spouses, receive healthcare benefits "on the same
basis" as the retirees. (1995 SPD at 87). They further contend
that "on the same basis" means that a spouse is entitled to

_____

[19](...continued)
shows that Century knows how to reserve its rights when it
chooses to do so:

> The Company expects the Plan to be permanent, but since
> future conditions cannot be anticipated or foreseen,
> the Company must necessarily, and does hereby, reserve
> the right to amend, modify or terminate the Plan at any
> time by action of its Board of Directors with approval
> of the Union . . . .

(1999 Pens. Plan § 6.1). Plaintiffs contend that the absence of
a similar reservation of rights in the CBAs or SPDs is indicative
of an intent to vest healthcare benefits. It might just as
easily be explained, however, that Century deemed a reservation
of rights as to healthcare benefits unnecessary inasmuch as it
deemed the subject to arise anew during each bargaining cycle.

Plaintiffs also note that the 1999 Pension Plan also has a
termination date and is effective only for "the duration of the
Labor Agreement." They rely upon language purportedly found on a
page of the 1999 Pension Plan that does not appear in the portion
of the record they cite. Nevertheless, they assert that since
these pension-related durational clauses could not be read as
"'unvest[ing]'" pension benefits then neither should any similar
language in the CBAs or the SPDs as it relates to healthcare
benefits. (Pls.' Reply at 11). The question of whether pension
benefits are vested is not before the court. Additionally, the
healthcare benefit termination language found in the CBAs and
SPDs appears clear on its face. A comparison of that language
with pension language found in an entirely different plan would
not advance plaintiffs' efforts to make the clear showing of
their likelihood of success on the merits at this stage of the
case.

lifetime healthcare benefits inasmuch as, according to plaintiffs, the retiree is so entitled.  Quite to the contrary, the 1995 SPD provides specifically that "Your coverage on account of a dependent [which includes a spouse] shall cancel on the date such person is no longer an eligible dependent as defined or upon your death, whichever occurs first."  (1995 SPD at 87 (emphasis added)).  Thus, although the spouse is entitled to "same basis" healthcare benefits with respect to the kinds of coverage, the duration of that coverage appears to end with the death of the retiree.

Fourth, plaintiffs contend that the presence of durational limits on other welfare benefits indicates that the retirees' healthcare benefits are not so limited and have vested.  Plaintiffs rely upon Keffer in support.  They assert that the agreements in that case specifically limited other benefits to the life of the collective bargaining agreement and provided for retiree medical coverage to continue until Medicare eligibility.  In Keffer, the applicable language explicitly provided that "'[p]articipation in . . . [the group insurance] program . . . shall terminate when such person becomes eligible for Medicare.'" Keffer, 872 F.2d at 64 (quoting applicable agreement).

While plaintiffs offer some language from the 2006 SPD for active employees supportive of their position, there is no

comparable language to that just noted in Keffer in any of the
CBAs or the SPDs in this action.  The agreements in Keffer are
simply different from those at issue here.  See, e.g., Keffer,
872 F.2d at 64 (observing that, unlike the circumstances here
presented, "the parties' later collective bargaining agreements .
. . continued to expressly limit the [active] employee coverage
to the lives of the agreements without similarly limiting the
retirees' medical coverage.").[20]

On this same point, Century cites District 29, United
Mine Workers of America v. Royal Coal Company, 768 F.2d 588 (4th
Cir. 1985).  In Royal Coal, the court of appeals had under
consideration a coal company's obligation to provide health
benefits to its retired employees beyond the expiration dates
contained in the National Bituminous Coal Wage Agreements of 1978
and 1981.

Most of the class members retired from signatory Royal
Coal Company ("Royal") prior to June 5, 1981, the effective date

---

[20]The closest language herein to that found in Keffer is
that identified by plaintiffs in their extrinsic evidence section
discussed earlier.  For instance, the 2006 SPD obligates Century
to reimburse the monthly Medicare premium paid by those retired
participants who reach age 65.  Under the Century Pension Plan,
however, an employee may retire at age 55, meaning that "this
promise would not be fulfilled for at least 10 years, well beyond
the duration of the applicable CBA."  (Pls.' Memo. in Supp. at
16).  This argument is not without some force.  Nevertheless,
Century contends that the language was intended "merely to offer
the benefit should a retiree . . . reach Medicare eligibility
while the benefit was being offered."  (Resp. Br. at 22).

of the 1981 Wage Agreement, and all of them retired prior to the
expiration of the 1981 Wage Agreement on October 1, 1984.  Royal
ceased all active mining activity during the life of the 1981
Wage Agreement and did not sign the subsequent 1984 Wage
Agreement.  Royal ceased providing health benefits to the class
members on October 1, 1984.

        The Wage Agreements in Royal Coal provided that
employees and retirees would receive certain health benefits but
that the benefits were apparently "guaranteed [only] during the
term of" the applicable Wage Agreements.  Royal Coal, 768 F.2d at
590-91.  Relying upon this language, and the earlier en banc
decision in District 17, Dist. 29, Local Union 7113, and Local
Union 6023, United Mine Workers of America v. Allied Corp., 765
F.2d 412 (4th Cir. 1985), the court of appeals in Royal Coal
concluded as follows:

    Based upon the en banc majority's interpretation of the
    1978 Wage Agreement in Allied Corp., especially when
    coupled with the more explicit language contained in
    the en banc dissent, we hold that Royal's obligation to
    provide health benefits and life insurance coverage to
    its retired and disabled coal miners under the 1978 and
    1981 Wage Agreements does not extend beyond the
    expiration of those Agreements.

Id. at 592.

        Turning to the contractual documents in this action as
they relate to plaintiffs' fourth argument, the 1988 CBA, which

31

was the first collectively bargained agreement that governed the parties' relationship, provided pertinently as follows in Article 15.A.2:

> It is understood that this Agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on May 25, 1988, except as otherwise provided in the applicable booklet, and further that <u>such benefits shall remain in effect for the term of this 1988 Labor Agreement</u>.

(1988 CBA at 116 (emphasis added)).  Indeed, as noted, all of the CBAs and SPDs from 1988 through the present contain language of this type.  Thus the somewhat distinguishable language in <u>Keffer</u>, coupled with the language in <u>Royal Coal</u> and <u>Allied</u> that appears favorable to Century's position, diminishes plaintiffs' contention.[21]

Finally, plaintiffs rely upon the extrinsic evidence summarized <u>supra</u>.  Some of that evidence might possibly have significance at a later point in the case.  If an as-yet unapparent ambiguity arises on the subject of vesting that would warrant consideration of matters extrinsic, the controversy surrounding the 2007 Master Plan SPD might bear on the question

---

[21]This is so despite plaintiffs' reply brief.  For example, plaintiffs there assert that these types of termination clauses only produce an ambiguity inasmuch as they do not state what happens to retiree healthcare benefits upon expiration of the CBA.  While this and other contentions proliferate some of the difficult interpretive issues in this action, they do little to advance plaintiffs' attempt to discharge their burden under <u>Obama</u>.

of whether there was an intent to vest.  It is also the case, however, as all parties concede, that the 2007 Master Plan SPD is not an operative plan document.  It never became effective and was superseded by the subsequently agreed upon 2006 SPD, published in January, 2008.[22]

The payment to former retirees of healthcare benefits after expiration of the 1988 CBA on October 31, 1990, and continuing during the 1990-92 Lockout from October 1990 to 1992 when the 1992 CBA became effective might have significance as well.  At the same time, Century asserts, somewhat weakly, that it had no dispute with the retirees during the 1990-92 Lockout and that there is, in any event, no indication that cessation of the retiree benefits was even considered during that time period.

Additionally, the Century Q&A document quoted earlier that was received by Mr. Walters in April 2006 and Mr. Cochran sometime in 2003, wherein it is stated that a retiree's surviving spouse is entitled to lifetime healthcare benefits, appears to be

---

[22]Century attempts to explain in great detail why no significance should be attributed to the 2007 Master Plan SPD. For example, Century asserts the document was (1) drafted hastily by a third-party vendor to comply with the Department of Labor's order to produce a plan document, and (2) "[m]uch of the language of the 2007 [Master Plan] SPD was . . . included by the third party without discussion with . . . [Century] . . . including [some of the] . . . language cited by the" plaintiffs.  (Resp. Br. at 26).

similar to extrinsic evidence identified by the decision in
Keffer as supporting the vesting determination reached in that
case.  See Keffer, 872 F.2d at 64.  The court will, however, not
reach the parties' extrinsic evidence if it ultimately concludes
that the governing documents are unambiguous.

In sum, for each contention offered by plaintiffs, an
equally or more compelling response is, in the main, presented by
Century.  Further, the court has not reached some potentially
meritorious, independent assertions made in the first instance by
Century.  For instance, some courts have concluded that
continuation language like that found in the 1995 and 1999 SPDs
cuts against a vesting determination.  See, e.g., John Morrell &
Co. v. United Food and Commercial Workers Intern. Union, AFL-CIO,
37 F.3d 1302, 1307 (8th Cir. 1994) ("The provision in the 1973
Master Agreement that continued health benefits for past retirees
is evidence that prior benefits were not vested."); Anderson v.
Alpha Portland Industries, Inc., 836 F.2d 1512, 1519 (8th Cir.
1988)("Were there an intent to vest, continuation language would
not be necessary.")

Under these circumstances, plaintiffs cannot satisfy
their burden at the first step of the Obama analysis.  They have
failed to make a clear showing that they are likely to succeed in

34

ultimately demonstrating Century's actions contravened either (1) the applicable CBAs or SPDs in violation of section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, or (2) sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) and (a)(3).[23]

III.

Based upon the foregoing discussion, it is ORDERED that plaintiff's motion for a preliminary injunction be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED: June 24, 2010

John T. Copenhaver, Jr.
United States District Judge

---

[23]For this reason, the court need not reach the merits of the parties' arguments concerning the remaining three Obama factors.