UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


HAROLD DEWHURST and DAVID BRYAN,
on behalf of themselves
and all other persons
similarly situated, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,

         Plaintiffs


v.                                    Civil Action No. 2:09-1546


CENTURY ALUMINUM COMPANY,
CENTURY ALUMINUM OF
WEST VIRGINIA, INC.,
CENTURY ALUMINUM MASTER WELFARE BENEFIT PLAN,
DOES 1 THROUGH 20,

         Defendants


MEMORANDUM OPINION AND ORDER


        Pending is defendants' (collectively "Century") motion

for summary judgment, filed February 26, 2014.  The extensions

of time and additional briefing submitted by the parties

culminated in the February 26, 2015, filing of plaintiffs'

response to defendants' supplemental brief.

I.

A.   Procedural Posture

On November 13, 2009, the individual plaintiffs, who are retired employees from a facility operated by one or more of the defendants, instituted this action in the United States District Court for the Southern District of Ohio.  They were joined by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("Union").  The plaintiffs are also members of a local union ("local union").  On December 23, 2009, the action was transferred here.  The court certified a class consisting of approximately 437 retirees, along with the benefit-eligible spouses and dependents of deceased retirees.

The two-count class action complaint alleged that Century's actions contravened the applicable collective bargaining agreements ("CBA") in violation of section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and violated sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B) and (a)(3).

The third amended complaint filed June 26, 2012, which is the operative pleading, changed the class definition to all

2

current or former employees of Century, along with their spouses, dependents and surviving spouses who either:

> (1) retired (other than with a deferred vested pension) from RAC or CAWV after February 6, 1989 and prior to November 1, 2010 and who are not currently receiving medical benefits from CAWV, (2) retired or retire (other than with a deferred vested pension) from CAWV on or after November 1, 2010 and prior to the effective date of a New CBA and who may be currently receiving medical benefits from CAWV, or (3) retired or retire from CAWV after the layoff at the Ravenswood Plant in February 2009 and prior to the effective date of a New CBA after losing their active medical coverage while on layoff and as to whom CAWV has denied or asserted that it will deny retiree medical coverage due to their not being enrolled in the active medical plan at the time of their retirement.

(Third Am. Compl. ¶ 32).  The operative pleading still contains the aforementioned claims.

On June 24, 2010, the court denied plaintiffs' motion for a preliminary injunction.  See Dewhurst v. Century Aluminum Co., 731 F. Supp.2d 506 (S.D. W. Va. 2010).  On June 30, 2010, plaintiffs noticed their appeal of that ruling.  On August 24, 2011, the court of appeals affirmed.  See Dewhurst v. Century Aluminum Co., 649 F.3d 287 (4th Cir. 2011).  Following motion practice and discovery, including a lengthy stay for purposes of permitting the parties to continue their attempts to settle the case, the court now addresses the instant dispositive motion.

B.   Factual Background

        Century operated an aluminum plant in Ravenswood, West Virginia ("facility").  In 1989, Ravenswood Aluminum Corporation, in an asset sale, purchased the primary aluminum smelting and related operations of the facility from Kaiser Aluminum Corporation ("Kaiser").  Up to that point, Kaiser and the Union had a 30-year bargaining history touching on the matters now in controversy.

        Ravenswood Aluminum Corporation assumed the then-current CBA between the Union and Kaiser, which had been executed on April 4, 1988.[1]  In 1997, the facility was renamed

---

[1]The court is aware of Century's position that, in 1989 when it purchased the facility, it assumed only the then-current CBA and not any earlier CBAs or the retiree healthcare benefits agreed upon in those earlier CBAs.  Nevertheless, the bargaining history at the facility provides a helpful historical context that may possibly aid the interpretive process.  See Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 62 (4th Cir. 1989)(stating that "'[i]n order to interpret . . . [a CBA] it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.'") (quoting Trans.-Comm. Empl'ees Union v. Union Pac. R.R. Co., 385 U.S. 157, 161 (1966)).

        It is also noted that plaintiffs offer one vesting argument that hinges upon interconnecting two agreements, one between the Union and a Century predecessor and the other between the Union and Kaiser, in an effort to show a post-termination event supporting vesting.  It does not appear proper to use a related agreement between Kaiser and the Union as evidence of a post-termination event tending to show Century's obligations to its retirees.  That is especially so inasmuch as Century was not a signatory to the Union/Kaiser agreement.

Century Aluminum of West Virginia, Inc.  In 1999, Pechiney Services of America ("Pechiney") purchased the fabrication side of the Ravenswood plant from CAWV.  Pechiney assumed the retiree medical liability for any current or future retirees of the fabrication side of the plant.

The retirees were represented by the Union during their employment by Century and its predecessors.  The Union negotiated a series of successive CBAs with Century and its predecessors governing the terms and conditions of hourly employment.  One component of these successive CBAs was the provision of retiree healthcare benefits, which appear to have been contemplated in the successive CBAs agreed upon since 1959.

The retirees at issue herein fall into one of two categories.  The first category consists of those who retired while a CBA for one of the following periods was in effect: (1) an April 4, 1988, CBA between Kaiser and the USW ("1988 CBA"), (2) a June 12, 1992, CBA between Ravenswood Aluminum Corporation and the USW ("1992 CBA"), (3) a November 30, 1994, CBA between Ravenswood Aluminum Corporation and the USW ("1994 CBA"), (4) a June 1, 1999, CBA between Century and the USW ("1999 CBA"), or (5) a June 1, 2006, CBA between Century and the USW ("2006 CBA").  The second category consists of employees retiring after the 2006 CBA expired on August 31, 2010.

The individual plaintiffs also retired while covered by one of the following summary plan descriptions ("SPDs"), which were generally issued in accordance with each operative CBA: (1) a June 12, 1992, SPD for the Retired Employees' Group Benefits Plan ("1992 SPD"), (2) a January 1, 1995, SPD for the Retired Employees' Group Benefits Plan ("1995 SPD"), (3) a June 1, 1999, SPD for the Retired Employees' Group Benefits Plan ("1999 SPD"), or (4) a January 1, 2008, SPD for the Retired Employees' Group Benefits Plan ("2008 SPD").

C.   The Termination of Retiree Healthcare Benefits

Century asserts that it dealt with a number of financial challenges beginning in 2007 based upon the volatility in aluminum prices.  It states that rising healthcare costs, Century's inability to sell aluminum at profitable prices, and other factors, contributed to cash operating losses of $34,000,000 in 2007 and $9,000,000 in 2008.  After curtailing all operations at the facility, Century suggests that it continued to suffer negative cash flow.  One component was approximately $14,250,000 in healthcare benefits provided to active, laid-off, and retired employees.  Century projected that the healthcare benefits for retirees would total $3.5 million for 2009.

All of the governing CBAs and SPDs provide that Century pays retiree health benefits for the term of each labor agreement.  The CBAs from 1988, 1992, 1994, 1999, and 2006 all state as follows:

> The Group Insurance Benefits shall be set forth . . . in booklets entitled Employees' Group Insurance Program and Retired Employees' Group Insurance Program, and such booklets are incorporated herein and made a part of this . . . Labor Agreement by such reference. . . . It is understood that this Agreement with respect to insurance benefits is an agreement on the basis of benefits and that the benefits shall become effective on [the various CBAs' effective dates], except as otherwise provided in the applicable booklet, and further <u>that such benefits shall remain in effect for the term of this . . . . Labor Agreement</u>.

1988 CBA at 116 (<u>see</u> same language found in 1992 CBA at 177; 1994 CBA at 182; 1999 CBA at 193; 2006 CBA at 95 (emphasis added as to all).  The underscored language is referred to hereinafter as the "durational clause."

Similarly, the 1992, 1995, 1999 and 2008 SPDs all contain the following clause, which is nearly identical to the durational clause, specifically providing that the retiree medical benefits shall remain in effect for the term of the labor agreement:

> It is understood that this agreement with respect to benefits is an agreement on the basis of benefits and that the revised benefits shall become effective on [the effective date of the Retired Employees' Group Insurance Program], except as otherwise provided herein, and further <u>that such benefits shall remain in effect for the term of the Labor Agreement</u>.

7

1992 SPD at 80; 1995 SPD at 92; 1999 SPD at 79; 2008 SPD at 40 (emphasis added as to all).  As the court noted generally in its decision denying the preliminary injunction, "[A]ll of the CBAs, and the SPDs incorporated therein, that have governed the Century/Union relationship following the sale from Kaiser specify that retiree healthcare benefits are effective only during the lifetime of the particular CBA in effect at the time." Dewhurst, 731 F. Supp.2d at 512-13 (quoted in Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290-91 (4th Cir. 2011)).

On October 19, 2009, Century announced that it would unilaterally modify or cancel the retiree medical benefits that it provides to retirees, spouses, surviving spouses, and dependents of retirees.  Effective January 1, 2010, Century retirees under the age of 65 were required to pay an annual deductible of $700 per family for in-network coverage, monthly contributions of $55 per month for retiree only and $110 per month for retiree plus one dependent coverage, and $175 per month for family coverage.  As to retirees over 65 years of age, Century terminated benefits entirely.  The letter containing the announcement asserted that Century possessed an unqualified right to unilaterally change or terminate health coverages at any time.

This action by Century has visited an exceptional burden upon the retirees and their families.  They assert that the healthcare benefits they historically received from Century are vested, last a lifetime, and are not subject to termination or modification.

D.    Collective Bargaining History

From 1959 through the present day, successive CBAs covering the facility have contained, or incorporated by reference, language obligating Century or its predecessors to provide some form of healthcare benefits at no cost to the retirees.  The 1959, 1962, 1963, and 1965 CBAs include the healthcare benefits negotiated for active and retired employees. The CBAs entered into thereafter reference other sources, such as Group Insurance Plan booklets and Summary Plan Descriptions (collectively "SPDs") incorporated into the CBAs by reference. The court summarizes the contents of the CBAs and SPDs from 1959 through 1985.

Article 15 of the 1959 CBA provides retiree healthcare benefits up to a stated annual maximum.  The spouse was subject to termination of benefits upon a retiree's death or reaching the same monetary maximum, whichever first occurred.  Article 21 of the 1959 CBA, which expired July 31, 1962, provided additionally

as follows: "[T]he terms and conditions of this Agreement, and each of them, shall continue in effect until July 31, 1962 . . . ." (1959 CBA at 75).  Essentially similar provisions are found in the 1962, 1963 and 1965 CBAs, together with a 1968 extension, that cover the years down to June 1, 1971.

In 1971, the parties began using the combination of a CBA and SPD during the bargaining cycle.  The 1971 SPD states that it is part of the 1971 CBA.  Upon the death of the retiree, his surviving spouse and dependent children continued to have coverage for six months.  The 1971 SPD specifically provided that its benefits "remain[ed] in effect for the term of the 1971 . . . [CBA]." (1971 SPD at 33).

The 1981 SPD contained a similar provision[2], as did the 1985 SPD which continued to provide retiree healthcare benefits, with the same proviso concerning the time limit of the coverage: "such benefits shall remain in effect for the term of the 1985 Labor Agreement." (1985 SPD at 68).

E.   Extrinsic and Other Evidence Beyond the CBAs and SPDs

Plaintiffs offer various pieces of evidence they believe supports their view of vesting.  The court notes the

---

[2]The parties furnish nothing further respecting the period from the 1971 CBA to the 1981 CBA.

10

evidence below, followed immediately in each by Century's response thereto.

### 1. The 1990 Labor Dispute

First, in 1990 a labor dispute developed between Ravenswood Aluminum Corporation and the Union.  Following expiration of the 1988 CBA on October 31, 1990, the parties attempted to negotiate a new CBA without success.  The 1,700 employees were locked out on October 31, 1990, and the facility was operated with managers and replacement workers.  A 16-month impasse followed, along with an additional, unexplained interval of three-and-one-half months, after which the 1992 CBA was executed.  During the 1990-92 Lockout, while no CBA was in effect, Century (then Ravenswood) no longer provided healthcare benefits to active employees.  It continued, however, to provide those benefits to retired former employees.[3]

---

[3] Plaintiffs cite Mid-Atlantic Regional Council of Carpenters v. Shamblin Const., Inc., 2012 WL 2026044 (S.D. W. Va. Jun. 5, 2012), as supporting their view that the payment of benefit contributions following the lapse of the agreement imposing the obligation warrants a denial of summary judgment in this context.  The circumstances in Shamblin were quite different.  For example, the parties differed concerning whether the applicable CBA had indeed expired.  Further, the voluntary pay-in of employer contributions spanned 19 years.  The decision does not aid the plaintiffs.

Century notes that, at the time of the lockout, it had only a handful of retirees on the books given the recent acquisition from Kaiser.  Additionally, the Union and Ravenswood Aluminum Corporation never discussed the issue of continuation of retiree medical benefits during the strike.  The matter also was not discussed within Century.

### 2. The "2007 Master Plan SPD"

In contrast to its historical approach, Century published a "2007 Master Plan SPD" without first consulting the Union.  The 2007 Master Plan SPD never became effective and is not an operative plan document.  Following some controversy on the point, set forth more fully _infra_, the Union and Century developed a jointly prepared SPD instead, which was published in January 2008.

The Union suggests that the circumstances following Century's unilateral publication of the 2007 Master Plan SPD indicates Century's view that retiree healthcare benefits are vested.  The 2007 Master Plan SPD included language reserving to Century the right to modify the "Plan Document and this SPD . . . ."  (Pls.' Ex. 19 at 4).  That provision, however, was withdrawn by Century after the Union objected.

12

In response, Century details the origin of the 2007 Master Plan SPD.  During continuing negotiations in 2007 respecting the contents of the as-yet undrafted SPD, the Department of Labor informed Century that it had received a complaint that Century had not issued updated medical SPDs.  The Department of Labor mandated that Century issue updated SPDs for both active and retired employees on an unstated, short time frame.  In response, Century retained a third-party consultant to quickly draft the document.  The consultant used its own template to do so, resulting in the modification and other language that was not a bargaining subject between Century and the Union.  This resulted in many objections by the Union concerning the content of the hastily prepared SPD.  As noted, Century withdrew the modification language, inasmuch as it was never a bargaining subject.  Century also explained to the Union the difficulty with the Department of Labor.  The document was eventually scrapped in its entirety.

Century also notes that, over an unspecified number of years, the retirees received medical enrollment forms asking their acknowledgment that Century had the right to modify or terminate the retiree healthcare coverage.  Neither the retirees nor the local union ever took exception to these requested acknowledgements.

### 3. Representations by Century Agents

The retirees assert that Century agents have repeatedly represented to bargaining unit members that retiree healthcare benefits last for a lifetime.  Benefits Manager Rosita Bauer, who worked for Century from 2000 to 2008, testified that several Century representatives, including its Human Resource Director, advised her that retiree medical benefits were to endure for the retirees' lifetimes.  She produced some of her own notes to support that view.

When a Century employee was preparing to retire, it was Ms. Bauer who prepared the necessary papers, met with the employee, and answered any questions.  She recollected that during her nine-year tenure she told nearly all retirees during their exit interviews that that they had lifetime medical coverage.  Also, Ms. Bauer worked for Jeff Tutalo, Century's Human Resources Director.  Ms. Bauer stated that Mr. Tutalo trained her as follows:

> [A]nyone who was an hourly retiree, the retiree and spouse had lifetime coverage from their retirement, and they had medical only. They did not have dental or vision as part of the medical package. If the retiree died, the spouse would be covered for her lifetime.

(Bauer Dep. at 17).[4]  She states she was similarly advised by Al

---

[4] Respecting Mr. Tutalo's views on the matter, Century asserts as follows:

14

Toothman, the former Century Manager of Administrative Services, and three fellow, lower-level employees. She further noted that certain insurers with whom Century contracted were all aware that the retirees had lifetime medical coverage.

Century responds that Ms. Bauer occupies a "low level" position. (Reply Br. at 14)[5]. It notes as well that her husband is a Century retiree. Additionally, Century points out several contradictory statements by Ms. Bauer supporting its view on the subject of vesting:

> She testified that she reviewed documents stating that Century had the right to terminate or modify the retiree medical plan at the time that the documents were distributed to retirees and testified that the documents accurately reflected the terms of the applicable plan.
>
> She testified that she reviewed and sent out to retirees company prepared enrollment forms that stated that the retirement medical plan could be terminated at any time -- and then testified that she believed these forms accurately reflected the terms of the plan.

------------------------

> [Mr.] Tutalo testified that he never told retirees or their surviving spouses that their medical benefits were guaranteed for life -- nor did he instruct anyone reporting to him to do so. Moreover, he affirmatively told over half of the retirees he met with that their medical benefits were not guaranteed.

(Reply Br. at 14 n.5 (citations omitted)).

[5] Century downplays Ms. Bauer's role, stating that she "was not a 'Manager' in any sense -- she had no one reporting to her, only had a high school degree, and testified that she was primarily trained by Barbara Casto, whose title was Personnel Clerk." (Reply Br. at 14 n.6).

She testified that medical benefits could be decreased for current retirees after a given contract expired, provided these changes were also made for active employees.

She testified that she told retirees upon retirement that they may have to pay a premium towards their retiree medical benefits in the future.

It is also undisputed that all managers responsible for administering retiree benefits testified uniformly they never told retires that their medical coverage could not be modified.

### 4.   Statements of Gordon Hopper

Plaintiffs next focus on one particular Century agent who does appear to be a trusted, senior employee.  Gordon Hopper, an individual whom they term the current Century plant manager, served on the company side during collective bargaining negotiations beginning in 1992.  Mr. Hopper testified that an employee was able to lock in certain benefits by retiring under the contract that provided for those benefits.

Century notes Mr. Hopper's testimony that he was not a trained labor relations specialist.  He also admitted that it was beyond his job responsibilities to discuss benefit matters with employees.  Importantly, in all his years as a manager, he never talked to employees about the duration of their retiree medical benefits.

16

Additionally, Century points out that events transpiring during the 2006 collective bargaining negotiations are in contrast to what plaintiffs, and perhaps Mr. Hopper, would paint as Century's understanding concerning retiree medical coverage.  When considering a medical coverage proposal for active and retired employees the Union's lead spokesperson asked whether, if the Union agreed to the proposal, Century would guarantee lifetime medical coverage to retirees under the new CBA.  Century rejected the request and declined to make any such guarantee.

### 5.  Retiree Evidence

There is also evidence from retirees concerning promises made to them regarding health benefits.  Nine retirees testified to promises they received concerning the lifetime nature of their healthcare benefits.  For example, Lesley Shockey testified that he and his wife met with Ms. Bauer for his exit interview in 2006.  She advised his wife, and supervisor Larry Weese advised Mr. Shockey, that the healthcare benefits were, essentially, for life.

Century responds that the class representatives, David Bryan and Harold Dewhurst, both testified they could point to no language in the governing documents providing lifetime medical

17

coverage and they were never advised as such by any Century
employee or extrinsic documents.  Indeed, Mr. Dewhurst testified
to his understanding that retiree medical coverage could be
decreased if the same occurred for active employees.

Plaintiffs further contend that surviving spouses were
also told that healthcare benefits would last a lifetime.  The
following Century informational handout was disseminated by Ms.
Bauer to all retirees from 2000 through 2009:

Q.    IS MY SPOUSE COVERED BY THE SAME HEALTH PLAN AND CAN
      HE/SHE CONTINUE THIS COVERAGE AFTER MY DEATH?

A.    Your spouse is covered by the same plan as you,
      provided he or she was your spouse at the time of your
      Retirement. If you predecease your spouse, he or she
      may continue coverage under the plan for his/her
      Lifetime.

(Shockey Dep. at Ex. 4)(emphasis supplied)).

Century attacks the Q&A document.  For example, it
notes that Ms. Bauer located a similar document in some of Mr.
Tutalo's old files after he left Century.  The Q&A document had
been sent to Mr. Tutalo by an employee at Pechiney's corporate
headquarters at the time of the sale of the fabrication side of
the plant.  Mr. Tutalo never provided the document to employees
when he met with them upon retirement.  Further, Ms. Bauer
admitted that it was not in the set of documents that Mr. Tutalo
directed Ms. Bauer to use when training her on what to provide
to retiring employees.  As Ms. Bauer testified, she drafted the

18

Q&A without consulting Mr. Tutalo or any of her superiors.  None of her superiors approved of, or even knew, that she was distributing the document.


II.


A.   Governing Law


1. The Summary Judgment Standard


A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the party's claim.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. <u>Id.</u>  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

### 2. Applicable Substantive Law

Much of the governing law applicable herein was set forth in the court's earlier decision denying the plaintiffs' motion for a preliminary injunction.  The court of appeals' decision in <u>Keffer v. H.K. Porter Company, Inc.</u>, 872 F.2d 60, 64 (4th Cir. 1989), remains central to the analysis.  That decision involved whether certain welfare benefits continued beyond the expiration of a collective bargaining agreement.  The following standard applied:

> In determining whether an employer's obligation to provide benefits to its retirees or their surviving spouses continues beyond the expiration of the collective bargaining agreement, we look to the parties' intent as expressed in their agreement. While the question therefore is primarily one of contract interpretation, collective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy. Therefore, "[i]n order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." Of course, as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties' intent. "The intended meaning of even the most explicit language can, of course, only be

21

understood in light of the context which gave rise to
its inclusion."

Id. at 62 (citations omitted); see also District 29, United Mine
Workers of America v. Royal Coal Co., 768 F.2d 588, 590 (4th
Cir. 1985) ("Whether an employer's obligation to provide
benefits to its retirees continues beyond the expiration of the
underlying collective bargaining agreement depends upon the
intent of the parties.  Moreover, whether the parties intended
such an employer's obligation to continue beyond the expiration
of the collective bargaining agreement is primarily a question
of contract interpretation.") (citations omitted).

     While the contract construction rules in the
collective bargaining context may be slightly more relaxed than
those governing other contracts, the polar star remains the
language chosen by the parties.  As this court noted in its
earlier Dewhurst decision,

     Courts will bar extrinsic evidence that is
     inconsistent with an unambiguous writing. See, e.g.,
     Pace v. Honolulu Disposal Serv., Inc., 227 F.3d 1150,
     1157-58 (9th Cir. 2000); Brown-Graves Co. v. Cent.
     States, Southeast & Southwest Areas Pension Fund, 206
     F.3d 680, 683 (6th Cir. 2000) (refusing, where
     collective bargaining agreement was unambiguous, to
     consider extrinsic evidence of "informal arrangement"
     between employer and union); see also Bonnell/
     Tredegar Industries, Inc. v. N.L.R.B., 46 F.3d 339,
     345 (4th Cir. 1995) ("We, too, conclude that it is
     clear from the language of the Agreement itself that
     the parties intended to retain the existing Christmas
     bonus plan; no extrinsic evidence as to the parties'
     intent in that respect is necessary.").

22

Additionally, the explicit and unambiguous
language found in a series of labor agreements might
be deemed the best indicator of the parties'
longstanding expectations of one another. See, e.g.,
20 Richard A. Lord, Williston on Contracts § 55:23
(4th ed. 2010)("While there is thus some debate
concerning how and the extent to which the parol
evidence rule applies to collective bargaining
agreements, there seems to be general agreement among
most courts that parol evidence of the parties'
bargaining history may be used to explain or
supplement the terms of the collective bargaining
agreement, but may not be admitted to prove an
agreement at variance with the normal or customary
meaning of the words chosen by the parties to express
their agreement."); 12 Employment Coordinator—Labor
Relations § 47:17 (Elec. ed. 2010) ("While there is
broad latitude in the admissibility of bargaining
history to construe a collective bargaining agreement,
where the meaning of the clause in question is clear,
no interpretation is necessary, and evidence of
bargaining history is not admissible to explain its
meaning.").

Dewhurst, 731 F. Supp.2d at 515-16.


In addition to these principles, the Supreme Court has

had occasion this year to address a situation similar to the

circumstances in the instant case.  In M & G Polymers USA, LLC

v. Tackett, 135 S. Ct. 926 (2015), certain retirees and others

instituted a class action against an employer, asserting claims

under the LMRA and ERISA.  Those claims alleged the employer

breached the governing collective bargaining agreements

putatively granting the retirees lifetime, contribution-free

health care benefits.  A durational clause in the CBA provided

for the CBA's renegotiation every three years.  In addition to

observing essentially the same quoted principles from Dewhurst

above, the Supreme Court, in concluding no lifetime-benefits

promise existed, stated as follows:

> The Court of Appeals also failed even to consider
> the traditional principle that courts should not
> construe ambiguous writings to create lifetime
> promises. . . .
>
> Similarly, the Court of Appeals failed to
> consider the traditional principle that "contractual
> obligations will cease, in the ordinary course, upon
> termination of the bargaining agreement." . . . [W]hen
> a contract is silent as to the duration of retiree
> benefits, a court may not infer that the parties
> intended those benefits to vest for life.

M & G Polymers, 135 S. Ct. at 936-937.


In addition to this now-settled law, as noted, the

precise language and circumstances in this action have earlier

been the subject of a published opinion by our court of appeals.

In the Dewhurst decision reviewing this court's denial of

plaintiffs' motion for a preliminary injunction, it was stated

as follows respecting the durational clauses:

> In the case at bar, the CBA language on the duration
> of the benefits at issue appears direct and plain
> "that such benefits shall remain in effect for the
> term of this [year] Labor Agreement." J.A. at 182. As
> the district court noted, "all of the CBAs and SPDs
> from 1988 through the present contain language of this
> type." Dewhurst, 731 F. Supp.2d at 520. This contract
> limit on the duration of benefits is similar to that
> in Royal Coal.
>
> In Royal Coal, the applicable CBA language stated that
> benefits "shall be guaranteed during the term of this
> Agreement." 768 F.2d at 590 (emphasis omitted). Based
> on this language showing "the intent of the parties,"
> id., we determined the benefits did "not extend beyond
> the expiration of" the CBA:

> Employer obligations and employee rights, under
> a collective bargaining agreement, do not
> survive the expiration of the agreement absent a
> clear intention of the parties.

> Id. at 592 (quotation omitted).

> In the face of the durational language in the CBAs,
> our clear precedent in Keffer and Royal Coal does not
> support a finding that the Retirees have made a
> showing, much less a clear showing, of a likelihood of
> success on the merits . . . .

Dewhurst, 649 F.3d at 292.


B.   Analysis


As noted, the relevant CBAs provide materially as

follows:

> The Group Insurance Benefits shall be set forth . . .
> in booklets entitled Employees' Group Insurance
> Program and Retired Employees' Group Insurance
> Program, and such booklets are incorporated herein and
> made a part of this . . . Labor Agreement by such
> reference. . . . It is understood that this Agreement
> with respect to insurance benefits is an agreement on
> the basis of benefits and that the benefits shall
> become effective on [the various CBAs' effective
> dates], except as otherwise provided in the applicable
> booklet, and further that such benefits shall remain
> in effect for the term of this . . . Labor Agreement.

The language is clear and unambiguous.  The retirees' healthcare

benefits remained in effect for the term of the applicable CBA.

There is no basis in light of this language to conclude those

benefits vested beyond the term of each CBA.  The collective

bargaining history supports this reading inasmuch as the

language, or its slight variant in the historical CBAs, has been
used by the parties in multiple CBAs for decades.

The plaintiffs understandably attempt to overcome the
clarity of the durational clause.  First, they rely upon
Quesenberry v. Volvo Trucks North America Retiree Healthcare
Benefit Plan, 651 F.3d 437 (4th Cir. 2011).  They contend the
decision stands for the broad proposition that "linking
eligibility" for retiree healthcare benefits to "an event that
would almost certainly occur after the expiration of the
agreement signal[s] the parties' intent[ion] to continue
retirement health benefits notwithstanding expiration" of the
current CBA.  Quesenberry, 651 F.3d at 441.

In Quesenberry, Volvo and the United Auto Workers
("UAW") restructured a longstanding employee benefit scheme.
The parties executed a three-year CBA to commence in 2005 (the
"2005 CBA").  The 2005 CBA set forth health insurance coverage
terms for retirees in two paragraphs, a "Coverage paragraph" and
a "Cost paragraph."  Plaintiffs in this action rely heavily upon
the fact that the Coverage paragraph included a durational
clause much like that in the CBAs here, namely, that Volvo would
continue coverage under the applicable benefit program "for the
duration of this Agreement."  Id. at 440.

26

Plaintiffs neglect to note, however, the import of the "Cost paragraph." The Cost paragraph was designed to flesh out some of the particulars, including the limits on Volvo's financial obligations under the Coverage paragraph. The Cost paragraph can be summarized as follows:

It imposed caps on Volvo's liability for retiree medical costs.

It dealt with costs in excess of these caps, by creating a Voluntary Employee's Beneficiary Association ("VEBA") trust, and requiring that Volvo make on the day the 2005 CBA expired a balloon payment equal to forty percent of a roughly $4 million total contribution to the VEBA trust.

The Cost paragraph then provided that, in the event the VEBA trust should be exhausted in the future, the parties could negotiate how to reduce costs and, if those negotiations proved unsuccessful, that Volvo could charge retirees premiums to cover costs over the cap using an agreed upon formula.

It originally contained a durational clause, like the Coverage paragraph, which was deleted at the UAW's request.

Id. Volvo refused to extend the healthcare benefits in the successor CBA. It unilaterally modified the benefits, claiming the Coverage paragraph durational clause as its authority for doing so.

The court of appeals focused on the Cost paragraph. Indeed, it observed that, "Were the Cost paragraph not in the agreement, Volvo would have a compelling point." Quesenberry, 651 F.3d at 440 (citing Royal Coal, 768 F.2d at 592). In

27

harmonizing the Coverage and Cost paragraphs, the court of appeals charted a different course than Volvo for several reasons.  For example, it observed as follows:

> It is almost inconceivable . . . that . . . [the parties' negotiation] mechanism would be triggered during the scope of the 2005 CBA. First of all, Volvo itself projected that the trust would not be exhausted until 2014, some nine years after an agreement that was contracted to last only three. More importantly, Volvo was required to make a $1.585 million contribution to the VEBA on the very last day of the 2005 CBA's term. It would be almost impossible to project the VEBA to run out during the 2005 CBA when roughly 40% of the trust's corpus was to be deposited on that final day, and Volvo does not contend that either party contemplated that unlikely scenario. To contend that the VEBA and its negotiated mechanism were good only until the expiration of the 2005 CBA thus requires an overactive imagination.

Quesenberry, 651 F.3d at 440-41.

Plaintiffs place much stock in the panel drawing an analogy between the CBA's Cost paragraph and the CBA in Keffer. The latter linked retiree health benefits not to termination of the CBA but rather to the retiree becoming eligible for Medicare.  The court of appeals in Keffer held it was that linkage, namely, tying the eligibility for benefits to an event that would almost certainly occur after the expiration of the agreement, that signaled an intention to continue benefits beyond CBA expiration.

But that argument is conclusively unavailable to the plaintiffs in this action.  The panel that heard the argument

and authored the opinion in this action seeking reversal of this

court's refusal of a preliminary injunction stated as follows:

> Applying ordinary principles of contract
> interpretation, we note that the collective bargaining
> agreement in Keffer differed materially from that
> before us here. In Keffer, retiree health benefits
> were explicitly linked not to termination of the
> agreement, but to a post-termination event, namely the
> date of the retiree's eligibility for Medicare. As the
> district court noted, "there is no comparable language
> . . . in any of the CBAs or the SPDs in this action.
> The agreements in Keffer are simply different from
> those at issue here." Dewhurst, 731 F.Supp.2d at 519.

Dewhurst, 649 F.3d at 292.  The observation is quite powerful

inasmuch as the same three-judge panel, on the same day, heard

both the appeal in Quesenberry and in this action.

Second, plaintiffs assert another significant post-CBA

termination event is the SPD language providing a dependent's

medical coverage ends upon the retiree's death.  This

observation adds little to the analysis.  In view of the

durational clause, this language simply relates to those

retirees who died during the life of a particular CBA.  It does

not mean the parties to a particular CBA intended to provide

lifetime healthcare benefits contrary to the durational clause.

Third, plaintiffs rely upon the Medicare reimbursement

provision.  They contend that since some employees will arrive

at the reimbursement age long after the CBA might expire, the

parties to the string of CBAs in this case must have meant for

29

medical coverage to vest.  This provision might just as easily
be explained as providing reimbursement in the event that
benefits are still offered at the time the Medicare premiums
come due.  It is too much, especially in light of the durational
clause, to suggest that this premium reimbursement provision
intended the retirees to have lifetime medical coverage.

Fourth, plaintiffs assert that the various company-
agent admissions and retirees' honestly held beliefs, recounted
<u>supra</u>, coalesce with such certainty that Century must have
intended for retiree medical coverage to vest.  As the court has
observed, practice, usage and custom pertaining to the CBAs may
have relevance.  As illustrated by Century's explanation of the
extrinsic and other evidence, however, the testimony on these
points, having now been fully developed, is too evanescent a
basis upon which to base a vesting decision running contrary to
the clear-cut terms of the durational clause.

Having considered each of the plaintiffs' contentions,
and inasmuch as the clarity of the durational clause trumps all
collateral considerations offered, Century is entitled to
judgment as a matter of law.

The court notes that it has withheld its decision
herein for a time in contemplation that Century may choose to

reopen the facility and perhaps reconsider its benefits decision.  Regrettably, an amicable resolution by the parties no longer appears attainable.  And so, the court must render its decision.

It is, accordingly, ORDERED that Century's motion for summary judgment be, and hereby is, granted.

### III.

Based upon the foregoing discussion, it is ORDERED as follows:

1.   That Century's motion for summary judgment be, and hereby is, granted; and

2.   That this action be, and hereby is, dismissed and stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED: September 9, 2015

_____
John T. Copenhaver, Jr.
United States District Judge